UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CANNISTRA REALTY, LLC,

                Plaintiff/Counterclaim Defendant,

    - against -

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

              Defendant/Counterclaim Plaintiff,

MICHAEL S. REGAN, in his official capacity as
Administrator of the United States Environmental
Protection Agency, and PAT EVANGELISTA, in
his official capacity as Director of the Superfund
and Emergency Management Division of the United
States Environmental Protection Agency, Region 2,

            Defendants.

-------------------------------------------------------------x

**OPINION & ORDER**

No. 19-CV-3558 (CS)

<u>Appearances</u>

Edward J. Phillips
Keane & Beane, P.C.
White Plains, New York
*Counsel for Plaintiff/Counterclaim Defendant*

Jennifer C. Simon
Assistant United States Attorney
Southern District of New York
New York, New York
*Counsel for Defendants/Counterclaim Plaintiff*

<u>Seibel, J.</u>

      Before the Court are cross-motions for summary judgment filed by:

1) Plaintiff/Counterclaim Defendant Cannistra Realty, LLC ("Cannistra"); and

2) Defendant/Counterclaim Plaintiff United States Environmental Protection Agency ("EPA")

and Defendants Michael S. Regan and Pat Evangelista, in their official capacities as EPA

Administrator and Director of Region 2 of the EPA Superfund and Emergency Management

Division, respectively (collectively, "Defendants").  (ECF Nos. 103, 110.)  For the following

reasons, Defendants' motion is GRANTED and Cannistra's motion is DENIED.

I.   **BACKGROUND**

   A.   **Facts**

The following facts are undisputed except where noted.[1]

   1.   **The Cannistra Property**

In 1996, Cannistra purchased a parcel of real property, slightly smaller than one acre,

located at 115-125 Kisco Avenue, Mt. Kisco, NY 10549 (the "Cannistra Property").  (P's 56.1

Stmt. ¶ 1.)  The Cannistra Property consists of a two-story building and a parking lot, which take

up "essentially the entire parcel, such that there is virtually no undeveloped land at the site."  (*Id.*

¶¶ 1, 4.)  Beginning on August 15, 2013, Cannistra signed a long term, exclusive lease with

Tesla to rent out the property as a sales and service center (the "Tesla Dealership").  (*Id.* ¶¶ 6,

---

[1] Cannistra responded to Defendants' Local Rule 56.1 statement in support of their
motion, (ECF No. 117 ("P's 56.1 Resp.")), but Cannistra separately submitted its own Local
Rule 56.1 statement, (ECF No. 107 ("P's 56.1 Stmt.")), which, as Defendants rightly point out, is
ordinarily improper when seeking summary judgment solely on an Administrative Procedure Act
("APA") claim.  A Local Rule 56.1 Statement ordinarily does "not aid the court in its
independent review of the administrative record" because "when a party seeks review of agency
action under the APA, the district judge sits as an appellate tribunal . . . [t]he entire case on
review is a question of law."  *Hauschild v. U.S. Marshals Serv.*, No. 13-CV-521, 2018 WL
3014095, at *1 (S.D.N.Y. June 15, 2018) (cleaned up), *aff'd sub nom. Atterbury v. U.S. Marshals
Serv.*, 941 F.3d 56 (2d Cir. 2019).  Because the issues and underlying facts of the two motions
for summary judgment are closely intertwined, however, I have nevertheless considered facts in
Cannistra's Local Rule 56.1 statement where properly supported by evidence.  For the sake of
convenience, this opinion cites to Cannistra's Local Rule 56.1 response where the facts are
undisputed and consistent with the underlying Administrative Record, (ECF Nos. 109-1 & 109-
2).  The outcome would be the same whether or not facts outside the Administrative Record are
considered on Cannistra's motion.

10.)  The Tesla Dealership sales showroom is open Monday through Friday from 10:00 a.m. to 7:00 p.m., Saturday from 10:00 a.m. to 6:00 p.m., and Sunday from 11:00 a.m. to 6:00 p.m., and the service center is open Monday through Friday from 8:00 a.m. to 6:00 p.m., and Saturday from 8:00 a.m. to 4:00 p.m.  (*Id.* ¶¶ 16-17.)  The Tesla Dealership ranks fifth highest in the country in terms of volume of new car deliveries for Tesla, (*id.* ¶ 11), and "[o]n its busiest days, the Tesla Dealership is visited by approximately 400-500 persons for various reasons, including customers returning with cars that need service, and individuals shopping for a new car," meaning the parking lot is "packed with parked vehicles," (*id.* ¶¶ 20, 27).

### 2. The CanRad Superfund Site

From approximately 1943 to 1966, the Canadian Radium and Uranium Corporation ("CanRad") extracted uranium, radium, and other radioactive elements from uranium-bearing sludge, watch dials, and other materials at a facility in Mt. Kisco.  (P's 56.1 Resp. ¶¶ 5-6.)  After the facility closed in 1966, the CanRad facility's buildings (a two-story concrete block building and two smaller one-story concrete block buildings) were demolished, and the former facility and surrounding areas were scraped.  (*Id.* ¶ 7.)  Today, the former site of the CanRad facility is a non-NPL[2] CERCLA[3] site (the "CanRad site"), although the precise borders and location of the site are not known, as the area was extensively redeveloped.  (*Id.* ¶¶ 5, 7.)  The Cannistra Property is located adjacent to the CanRad site.[4]  (*Id.* ¶ 14.)

---

[2] The NPL, or "National Priorities List," is "a list of sites of national priority among the known releases or threatened releases of hazardous substances, pollutants, or contaminants that are eligible for long-term remedial action."  (P's 56.1 Resp. ¶ 3.)

[3] CERCLA is the acronym for the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.*

[4] While Cannistra disputes that the Cannistra Property is located adjacent to the CanRad site because the precise boundaries of the CanRad site are not known, (P's 56.1 Resp. ¶ 14),

Investigations at the CanRad site performed in the 1970s, 1980s and 1990s indicated "that elevated levels of radiation remained in soils at the former CanRad facility." (*Id.* ¶ 8.) Investigation by EPA in the 1990s and early 2010s found that measurable residual radiological contamination remained at the CanRad site, but no further action was required. (*Id.* ¶¶ 9-10.) In 2015 the current owners of the CanRad site asked EPA to perform additional sampling and testing to determine if a CERCLA removal action was warranted. (*Id.* ¶ 11.) EPA conducted a number of tests on the CanRad site from 2015 to 2017, which found "significantly elevated levels of radium-226" that were "significantly higher than EPA's site-specific action level," along with "elevated gamma readings in the northeast portion of the former CanRad facility property at the border with the Cannistra Property." (*Id.* ¶ 13.)

### 3.      EPA's Attempts to Inspect the Cannistra Property

Based on the assessment done at the former CanRad Site and the known history of the facility, EPA believed that the Cannistra Property might be contaminated with radioactive substances. (*Id.* ¶ 15.) Accordingly, EPA determined it was necessary to investigate at the Cannistra Property to learn the extent of any release of hazardous radioactive materials and whether there were risks to the environment and human health that would require a response from EPA. (*Id.*)

EPA planned to perform three investigatory activities at the Cannistra Property. The first was radon sampling, to determine whether radiological contamination might be impacting indoor air quality and presenting a public health concern to occupants of the building at the Cannistra

_____

Cannistra does not dispute Defendants' contention that EPA observed elevated gamma readings and concentrations of radium-226 at the CanRad site "at the border with the Cannistra Property" and "close to the boundary with the Cannistra Property," respectively, (*id.* ¶ 13). It thus implicitly admits that the Cannistra Property does, for all intents and purposes, border the CanRad site.

Property.  (*Id.* ¶ 16.)  This sampling would involve "plac[ing] hockey puck-sized, radon canisters indoors in the building at the Cannistra Property and [leaving] the canisters, undisturbed, for 72 hours," after which EPA would collect the canisters and have them analyzed by a laboratory. (*Id.* ¶ 17.)  The second planned investigatory activity involved radiological screening outside the building, in order to identify any locations and levels of potential radiological concern.  (*Id.* ¶ 16.)  "EPA anticipated utilizing a gamma probe attached to a computer and a geographical positioning system device that would both be mounted on top of a mobile unit (it was anticipated that this mobile unit would be approximately the size of a baby-jogging stroller) and pushed by hand in open areas of the Cannistra Property."  (*Id.* ¶ 18.)  EPA planned to analyze the results to confirm appropriate soil sampling locations.  (*Id.*)  The third activity would involve soil sampling, conducted via a direct-push "Geoprobe" soil sampling device, roughly the size of a small car, which would collect soil samples down to eight feet in depth. (*Id.* ¶¶ 16, 19.)  EPA initially planned to collect soil from ten locations throughout the Cannistra Property, with each boring taking up to two hours to complete. (*Id.* ¶ 19.)

EPA's standard practice for response activities under CERCLA is to first seek access to a property with consent of that property's owner.  (*Id.* ¶ 23.)  Typically, an on-scene coordinator ("OSC") assigned to a site contacts the owner to explain the need for access and provides a standardized form, which may be modified to include certain site-specific information and circumstances, and requests that the property owner sign the form to grant EPA access to the property on consent.  (*Id.*)

On May 10, 2018, the designated OSC for the CanRad site, Daniel Gaughan, placed a phone call to Cannistra's principal to discuss EPA's need for access to the Cannistra Property, and provided Cannistra with documents and other relevant data.  (*Id.* ¶ 24.)  On May 18,

Gaughan and EPA Assistant Regional Counsel Margo Ludmer spoke with Cannistra's representatives, again explaining the need for access to the Cannistra Property.  (*Id.*)  Three days later, EPA provided Cannistra with EPA's standardized Consent for Access to Property form, which was modified to specify that EPA would be "Performing radiological survey activities; Collecting radon samples from within site buildings; and Collecting environmental samples" at the Cannistra Property.  (*Id.* ¶ 25.)  Ludmer followed up with Cannistra's counsel by email on May 31, requesting that Cannistra advise EPA as soon as possible whether it would grant access or not.  (*Id.*)  In addition, Ludmer advised Cannistra that the matter was time sensitive, as EPA sought to perform the work in June of 2018, and arrangements would need to be made with EPA's contractor.  (*Id.*)

During these initial communications, Cannistra expressed concerns about the impact of EPA's work on the business operations of the Tesla Dealership, including that Tesla could terminate the lease because of these disruptions.  (*Id.* ¶ 26.)  In response, by email dated June 7, EPA advised Cannistra that EPA could potentially perform "some or all of the work during non-business hours, dependent upon the dealership's hours of operation and EPA availability/payment of overtime compensation."  (*Id.*)  In the same email, EPA also advised, in response to a possibility raised by Cannistra, that "EPA does not make funds available to compensate property owners in [Cannistra's] position, nor would EPA indemnify [Cannistra]" for losses it might suffer as a result of the work.  (*Id.* ¶ 27; *see* ECF No. 109-2 at 456.)

In a June 12, 2018, email, "Cannistra proposed to grant access to EPA for one day only, July 4, 2018, when the Tesla dealership would be closed for the holiday."  (*Id.* ¶ 28.)  Cannistra advised EPA that the dealership was "very busy and . . . the parking lot is occupied with a number of vehicles that are stored, are waiting to be serviced or are customers' vehicles visiting

the site." (*Id.*)  Because of the various activities that needed to be completed, EPA advised

Cannistra, by email dated June 15, that access could not be limited to one day.  (*Id.*)  Although

EPA told Cannistra that it "may be possible for EPA to arrive at the property a few hours before

the dealership opens to complete a portion of the work (e.g., placement/collection of the radon

canisters)," the remaining work would need to be completed during normal business hours.  (*Id.*)

EPA again explained that access was needed to assess the potential presence of radiation at the

Cannistra property and the possibility of associated health risks to individuals, and provided

Cannistra with additional information regarding the planned work, along with a map of the

proposed sampling locations.  (*Id.*)

After this June 15, 2018 communication, EPA did not receive a substantive response to

EPA's request for access until August 29, 2018, when EPA received a letter from Cannistra

setting forth "relevant points that need to be included in any [access] agreement," and advising

EPA that "once [Cannistra] ha[s] EPA's concurrence as to these terms, we can then prepare the

relevant underlying document to allow EPA and its contractors access to our client's property."

(*Id.* ¶¶ 29-30.)  Cannistra's "points that need[ed] to be included"[5] were the following:  a

limitation of the work to agreed-upon dates and times when the Tesla dealership was not open

for business; a two-phased approach to the work, whereby EPA would conduct the radiological

screening and radon sampling and provide that data to Cannistra prior to Cannistra's grant of

access for the soil sampling; specific insurance coverage for Cannistra and Tesla by EPA's

contractor; indemnification of Cannistra and Tesla for any loss of income or termination of the

---

[5] Cannistra characterizes these items as "accommodation requests," (*see* ECF No. 108 at
13, 15-17, 21-22), while Defendants characterize them as "pre-conditions," (*see* ECF No. 111 at
2, 16-20, 31-34), or "demands," (*see id.* at 13-17, 20, 35).  Semantics aside, it is clear that
Cannistra was saying that it was not going to consent to EPA's access unless its "requests" were
met, which makes them conditions.

lease; advance written notice for access; prohibition on storing of equipment on the Cannistra Property overnight; and EPA restoring the Cannistra Property to Cannistra's reasonable satisfaction after all of the inspection activities were concluded.  (*Id.* ¶ 30.)

While EPA agreed to the last three "points," the remainder were unacceptable to EPA, which advised Cannistra on August 30, that "[i]n accordance with EPA guidance, conditions that restrict or impede the manner or extent of EPA response work, or that precondition access on indemnity or compensatory obligations, are to be treated as denial of consent to EPA access." (*Id*. ¶ 37.)  The email also advised Cannistra that, if it continued in its denial of access, EPA would consider its enforcement options.  (*Id.*)

After an in-person meeting between the parties at which they engaged in further discussions, Cannistra on November 9, 2018  sent a second letter to EPA stating that it "wish[ed] to have confirmation as to the terms upon which access will be granted."  (*Id.* ¶ 39.)  These "terms" included:

> (1) that Cannistra and the tenant be named as an additional insured on the contractor's and any subcontractor's general liability and worker's compensation insurance and proof of same be provided in advance of work commencing, (2) that the air canisters for the radon testing be installed and removed during the non-operating hours of the tenant, (3) that the outside radiological screening be completed during overnight hours or commence on a Sunday at 7:00 a.m. and be completed prior to the tenant's operations commencing at 11:00 a.m., and (4) that only once the results of the radon and gamma survey testing, i.e. the radiological screening, are received and provided to Cannistra would Cannistra then discuss a schedule for installing the soil borings, should such additional work be necessary.

(*Id.*) (cleaned up).

In an email dated December 4, 2018, EPA advised Cannistra that the November 2018 Letter amounted to "a clear denial of access," and that Cannistra's "pre-conditions to access [were] not reasonable" as they would "cause delay, result in additional cost, and pose additional safety concerns for our workers."  (*Id.* ¶ 40.)

### 4.      The Administrative Order and EPA's Access to the Property

On March 12, 2019, EPA issued an Administrative Order, (ECF No. 113 Ex. B ("AO") at 17-23),[6] pursuant to section 104(e)(5) of CERCLA and 40 CFR § 300.400, (*id.* at 17; P's 56.1 Resp. ¶ 43).  It required Cannistra to provide EPA with "full and unrestricted entry and access to the Subject Property for the purpose of performing investigatory response activities."  (AO at 20.)  It also afforded Cannistra an opportunity to request a conference with EPA "on any matter pertinent to [the Administrative Order], including its applicability, the factual findings, the conclusions of law or determinations upon which it is based, or any other relevant and material issues or contentions that Respondent may have regarding this Order."  (*Id.* at 6.)  Cannistra requested a conference, and it was held before a neutral EPA officiant on April 4, 2019, at EPA's offices in lower Manhattan.  (P's 56.1 Resp. ¶ 44.)

Following the conference, on April 11, 2019, the neutral EPA officiant issued a letter stating that EPA had considered the issues raised by Cannistra and had determined that no modifications to the Administrative Order were appropriate or necessary.  (*Id.* ¶ 49.)  The letter explained that "[t]he proposed testing appears to be minimally intrusive and designed to cause the least disruption to the tenant's business, especially considering the anticipated limited duration of the testing."  (*Id.*)  EPA then informed Cannistra by letter that the Administrative Order would become effective on April 17, 2019.  (*Id.*)

Sometime in April 2019 – nearly a year after EPA first advised Cannistra that it needed to conduct investigative testing at the Cannistra Property – Cannistra advised Tesla for the first time that such work would be necessary.  (*Id.* ¶ 50.)  On April 17, 2019, the day the Administrative

---

[6] Citations to page numbers in ECF No. 113 Ex. B, which contains the Administrative Order and the attachments thereto, refer to the page numbers generated by the Court's Electronic Filing System.

Order was to go into effect, the parties again engaged in emails back and forth, discussing the possibility of EPA entering the property on consent.  (*Id.* ¶ 51.)  Cannistra represented that Tesla preferred that the work be performed on Monday through Thursday, to avoid the dealership's busiest days, during non-business hours.  (*Id.*)  In response, EPA offered to perform the work Monday through Thursday, but again explained that EPA could not agree to perform work outside of normal business hours for health and safety reasons.  (*Id.* ¶ 53.)

At a court-mandated settlement conference in this action, held on July 24, 2019, the parties reached an agreement under which Cannistra consented to EPA access.  (*Id.* ¶ 55.)  EPA entered on September 8, 2019, and performed the investigatory activities, without incident, on September 8 and September 9, 2019.  (*Id.* ¶ 57.)  The radon canisters were collected from the property on September 11, 2019.  (*Id.*)

### B.    Procedural History

Cannistra filed this action on April 22, 2019, shortly after the effective date of the Administrative Order.  (ECF No. 1.)  The Complaint alleged that the Administrative Order violated 42 U.S.C. § 9604 because it failed to provide that access to the Cannistra Property be at reasonable times, and that the Administrative Order was arbitrary and capricious for "failing to make any findings of fact relevant to the reasonableness of the hours of access directed by EPA." (*Id.* ¶¶ 39-57.)  Defendants answered on June 24, 2019, and brought counterclaims seeking to compel Cannistra to comply with the Administrative Order and asking the Court to assess a civil penalty against Cannistra.  (ECF No. 32.)  Cannistra answered the counterclaims on July 17, 2019.  (ECF No. 34.)

The Court entered a discovery schedule on July 30, 2019.  (ECF No. 37; *see* Minute Entry dated July 30, 2019.)  After several extensions, discovery disputes, and settlement

conferences, both Cannistra and Defendants filed pre-motion letters regarding anticipated motions for summary judgment, (ECF Nos. 85, 87), and responded to each other's letters, (ECF Nos. 89, 90). On September 3, 2020, the Court held a pre-motion conference. (Minute Entry dated Sept. 3, 2020.) The instant motions followed.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

This standard applies to cross-motions for summary judgment.  *See Morales v. Quintel Ent., Inc*., 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014).  Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).  But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together. *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015); *Chartis Seguros*, 3 F. Supp. 3d at 179.

III.    **DISCUSSION**

Under CERCLA, EPA is tasked with removing, remediating, and mitigating releases and threatened releases of hazardous substances or any "pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare."  42 U.S.C. § 9604(a)(1).  Accordingly, "if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant," *id.* § 9604(e)(1), EPA is authorized to enter "any vessel, facility, establishment or other place or property where entry is needed to determine the need for response or to effectuate a response action," *id.* § 9604(e)(3)(D).  This entry power may only be exercised at "reasonable times," however, *id.* § 9604(e)(3), and "only for the purposes of determining the need for response, or choosing or taking any response action . . . , or otherwise enforcing the provisions of this subchapter," *id.* § 9604(e)(1).  If the property owner does not consent to a request for access, EPA may issue an order directing compliance with the request.  *See id.* § 9604(e)(5)(B).

The claims to be decided on these cross-motions for summary judgment are (1) whether the Administrative Order should be set aside for failing to comply with the requirements of CERCLA, 42 U.S.C. § 9604(e), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and (2) whether Cannistra should be subject to a CERCLA civil penalty for unreasonably failing to comply with the Administrative Order and denying EPA access to the Cannistra Property under 42 U.S.C. § 9604(e)(5)(B).

A.    **The Administrative Order**

Cannistra's principal argument is that the Administrative Order is arbitrary and capricious because it failed to evaluate potential interference with the operations of the Tesla Dealership.  (ECF No. 108 at 21.)  Specifically, Cannistra contends that the Administrative Order

13

fails to comply with the APA and CERCLA's "reasonable times" requirement because the order (1) "does not mention that the Property is used as an automobile dealership and service center, *i.e.*, the Tesla Dealership;" (2) "does not mention the days/hours of operation of the Tesla Dealership at the Property;" (3) "does not mention any of the physical constraints on the Property that would impact upon EPA's ability to safely maneuver a drilling rig on the site to conduct invasive soil sampling;" (4) "does not mention the number of employees, customers or other individuals who visit the Property on a day-to-day basis;" (5) "does not mention the number of automobiles and delivery vehicles that enter and exit the Property on a day-to-day basis;" and (6) "does not mention Cannistra's offer to reimburse EPA for all costs associated with performing soil sampling at the Property at night in order to avoid impacting the business operations of the Tesla Dealership." (*Id.* at 22-23.)

When reviewing an agency action under the APA, "a reviewing court must uphold agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *County of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430-31 (2d Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)). "Judicial review of agency action under the arbitrary and capricious standard is necessarily narrow," *Teleanu v. Koumans*, 480 F. Supp. 3d 567, 576 (S.D.N.Y. 2020) (cleaned up), and "[u]nder this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1905 (2020) (cleaned up). "To determine whether an agency has acted in an arbitrary and capricious fashion, we ask whether the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and

the choice made."  *Waterkeeper All., Inc. v. U.S. Env't Prot. Agency*, 399 F.3d 486, 498 (2d Cir.

2005) (cleaned up).  An agency decision will be set aside only if the agency

> has relied on factors which Congress had not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product of
> agency expertise.

*Bechtel v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 710 F.3d 443, 446 (2d Cir. 2013) (cleaned up).

Cannistra points to no provision in CERCLA, the APA, or EPA policy that mandates that

an Administrative Order for access contain a robust discussion of particular facts, or that every

fact evaluated and considered by an agency must be included in writing in the final order.

Instead, Cannistra relies principally on two EPA regulations that outline factors that Cannistra

says EPA must consider when evaluating "reasonable times" to enter a property.  (*See* ECF No.

108 at 3; ECF No. 118 at 8-9.)

Cannistra first urges that CERCLA's "reasonable times" requirement should be read to

incorporate EPA Directive 9829.2.[7]  Cannistra in its opening brief selectively and misleadingly

quoted this provision, (ECF No. 108 at 3), but in its reply brief concedes that it concerns not

"reasonable times" for entering a property, but rather the period for requesting a conference

following the issuance of an Administrative Order, (ECF No. 118 at 8-9):

> [T]he [administrative] order should advise the respondent that the administrative record
> upon which the order was issued is available for review and that an EPA officer or
> employee will be available to confer with respondent prior to the effective date of the
> order.  The length of the time period during which such a conference[] may be requested
> should be reasonable under the circumstances.  In deciding what is a reasonable time
> period, *consideration should be given to the interference access will cause with onsite
> operations, the threat to human health and the environment posed by the site, and the
> extent of prior contacts with the respondent*. . . .  Following the time period for the

---

[7] A copy of EPA Directive 9829.2 is annexed to Plaintiff's counsel's declaration, (ECF
No. 104-15), and is also available at https://www.epa.gov/sites/default/files/2013-
09/documents/cont-access-mem.pdf.

conference and any conference, the issuing official should send a document to the respondent summarizing any conference, EPA's resolution of any objections, and stating the effective date of the order.

EPA Directive 9829.2 at 11 (emphasis added).  Similarly, Cannistra points to background information published during promulgation of an EPA rule for on-site civil inspections, (ECF No. 118 at 8-9), which was not published until almost a year after the issuance of the Administrative Order.  *See* On-Site Civil Inspection Procedures, 85 Fed. Reg. 12,224, 12,224 (Mar. 2, 2020).  It states that "EPA inspectors should generally conduct inspections during the facility's normal work hours" but may need to enter at other times, and "[w]here possible, for announced inspections, EPA inspectors shall *take reasonable steps to work with the facility to agree on a workable schedule for accessing areas for the inspection*."  *Id.* at 12,224-25 (emphasis added).  Cannistra argues that these regulatory prescriptions, while they do not speak directly to the "reasonable times" requirement in CERCLA, should inform the Court's evaluation of the Administrative Order.  I do not find this argument convincing, but even assuming Cannistra's interpretation is correct, EPA has satisfied these requirements.

The Administrative Record makes plain that EPA considered "the interference access [would] cause with onsite operations."  EPA Directive 9829.2 at 11.  EPA specifically attached to the Administrative Order, and included in the Administrative Record, both the August 2018 and November 2018 letters submitted to EPA by Cannistra, which outline that the Cannistra Property "is an active automobile dealership where cars are serviced, sold, new vehicles delivered to customers and owners recharge their electric car[s]," that "[a]t any given time during the day, there are approximately 30 to 40 employees at the site, with an equal number of customers present," that "[i]n addition to the pedestrian traffic of the employees and customers, cars are entering and exiting the site throughout the day," and that "[e]mployees move cars within the site to bring them into the service bays or to make room for customers to collect cars

or receive new inventory." (AO at 173-78.) EPA also attached an aerial photograph of the Cannistra Property to the Administrative Order, which shows that the property consists of a building and a parking lot. (*Id.* at 108.)[8] Courts must "presume that [the agency] has taken into account all of the evidence before [it], unless the record compellingly suggests otherwise," *Xiao Ji Chen v. U.S. Dep't of Just.*, 471 F.3d 315, 337 n.17 (2d Cir. 2006), and Cannistra fails to identify anything in the record, let alone anything compelling, that suggests that that standard is met. I find, therefore, that EPA considered the arguments raised by Cannistra regarding potential interference with its onsite operations but determined that Cannistra's proposals to minimize that interference were too burdensome in light of the "threat to human health and the environment posed by the site." EPA Directive 9829.2 at 11.

Additionally, by Cannistra's own admission, EPA had an extensive amount of "prior contacts with the respondent," *id.*, including letters, emails, and in-person meetings, before issuing the Administrative Order, (*see* P's 56.1 Resp. ¶¶ 24-31, 37-40). These prior contacts clearly indicate that EPA took "reasonable steps to work with the facility to agree on a workable schedule for accessing areas for the inspection," On-Site Civil Inspection Procedures, 85 Fed. Reg. 12,224, 12,224-25 (Mar. 2, 2020),[9] but that the parties were simply unable to come to terms.

---

[8] Further, the Administrative Record contains a "Phase I Environmental Risk Review" report from 2013, which includes several maps and photographs of the property as it appeared at the time, including the building and parking lot, (ECF No. 109-1 at 37-55), along with several contemporary photographs of the property showing its use as a Tesla Dealership, which were apparently submitted to EPA by Cannistra on April 5, 2019, before the effective date of the Administrative Order. (ECF No. 109-2 at 248-53). Citations to page numbers in the Administrative Record, (ECF Nos. 109-1 & 109-2), refer to the page numbers generated by the Court's Electronic Filing System.

[9] Indeed, even after the issuance of the Administrative Order, EPA agreed to Cannistra's request that it focus its work on Monday through Thursday. (P's 56.1 Resp. ¶ 53.)

Cannistra correctly points out that "[a]n agency action simply cannot be upheld where a court is left to guess as to the agency's findings or reasons," *Time, Inc. v. U.S. Postal Serv.*, 685 F.2d 760, 773 (2d Cir. 1982) (cleaned up), and that courts may not "supply a reasoned basis for the agency's action that the agency itself has not given," *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 658 F.3d 200, 215 (2d Cir. 2011).  The reasons for EPA's actions here, however, are readily discernable from the Administrative Order and the underlying Administrative Record: EPA had reason to suspect that hazardous radioactive materials were present on the Cannistra Property and needed to enter to conduct necessary testing and inspections in the face of what it considered unreasonable demands amounting to a denial of access.  The Administrative Order set forth relevant facts, including descriptions of radioactive contamination at the adjacent CanRad site, which formed the basis of EPA's determination that the adjoining Cannistra Property may have been contaminated during prior demolition activities, (AO at 18); a description of the types of sampling EPA deemed necessary and the reasons therefor, (*id.* at 19), with an attached "Draft Site-Specific Quality Assurance Project Plan" detailing the same in further detail, (*id.* at 50-170); and the reasons why EPA determined that Cannistra's pre-conditions to access were unacceptable, (*id.*).  The Administrative Record contains reference to EPA's safety concerns about night work, (ECF No. 109-2 at 235-36), its view that Cannistra's proposed conditions were cost-prohibitive and would result in delay, (*id.* at 227-28, 235), and its characterization of many of Cannistra's access conditions as "well beyond the norm," (*id.* at 224).

In reviewing an Administrative Order, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).  Even under Cannistra's generous understanding of what CERCLA

and the APA require, EPA meets this standard.[10]  The law gives the EPA authority to take

necessary measures to address potential hazards, even if it inconveniences private property

owners.  Cannistra seemed to regard its interactions with EPA as a negotiation between parties

with equal bargaining power, but CERCLA gives EPA the right to say "enough is enough," and

to resort to an order, when a property owner attempts to dictate the schedule and manner in

which EPA discharges its statutory duties.  EPA acted reasonably in doing so here.

---

[10] I find Cannistra's argument that EPA improperly denied its request for insurance coverage difficult to follow and unpersuasive.  Cannistra argues that "[w]hen the EPA performs environmental testing on real property using independent contractors, it routinely accommodates requests from owners of such properties that contractors furnish proof of coverage and make them additional insureds," (ECF No. 108 at 24), but the only evidence or authority that EPA offers to this effect is two deposition answers from Eric Wilson, Acting Director of the Emergency and Remedial Response Division, Region 2 at the time EPA issued the Administrative Order.  Wilson said that EPA "tr[ies] to accommodate" requests by property owners to be added to the insurance policy of EPA's contractor, so long as "it costs them nothing extra to list" and "it's not a condition of access."  (ECF No. 104-14 at 95:3-12, 115:22-24.)  This testimony is hardly definitive, and in any event it does not suggest any obligation on EPA's part.  Further, Cannistra concedes that EPA agreed to have its contractor list Cannistra as an additional insured, (ECF No. 108 at 5), and while Cannistra apparently never received documentation that that occurred, (id.; ECF No. 118 at 9), there is no record basis to conclude that it did not.  Cannistra also contends that it was not seeking to be made an additional insured for purposes of workers' compensation insurance at the time the Administrative Order was issued.  (ECF No. 108 at 15; ECF No. 115 ¶¶ 24-27.)  That may be so, but Cannistra's "terms" in the written correspondence of November 9, 2018, plainly include that it "be named as an additional insured on the contractor's and any subcontractor's general liability and worker's compensation insurance."  (ECF No. 109-2 at 232.)  In any event, the precise timeline of what insurance coverage demands were made, and when, are not material to the outcome of this motion.  Nor am I persuaded by Cannistra's argument that EPA must not have considered its and Tesla's concerns because Wilson, at the time of his deposition, could not remember what observations he had made of the Cannistra Property when he visited the CanRad site or even whether it was a car dealership at the time.  (ECF No. 108 at 23.)  Wilson testified that before determining whether the Administrative Order was consistent with EPA's access policies, he would have conferred with the OSC and other EPA staff who had "eyes on the property."  (ECF No. 104-14 at 138:3-13.)

B.     **Civil Penalties**

Defendants argue they are entitled to summary judgment on their counterclaim for civil penalties.  CERCLA provides that a "court may assess a civil penalty not to exceed $59,017 for each day of noncompliance against any person who unreasonably fails" to allow access to property or comply with an administrative order directing access.  42 U.S.C. § 9604(e)(5)(B), *as modified by* Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, as amended; 40 C.F.R. § 19.4, *as modified by* 85 Fed. Reg. 83,818, 83,821 (Dec. 23, 2020).  Defendants seek penalties for the period April 17, 2019 (the effective date of the Administrative Order) to July 24, 2019 (the date the parties agreed on access), (*see* ECF No. 111 at 34), except for May 13-28, 2019 (a period for which the Government agreed it would not seek penalties for non-compliance), (*see* ECF No. 23).[11]

Cannistra does not appear to dispute that it failed to comply with the Administrative Order from its effective date, April 17, 2019, until it agreed to provide access on July 24, 2019.  Instead, Cannistra posits that its reasons for failing to comply with the Administrative Order and denying consent for EPA to access its property – mitigating disruptions to its tenant's business – were not unreasonable.

The parties both acknowledge that there is limited case law on CERCLA civil penalties in the context of access to real property, and Cannistra and Defendants differ greatly in what legal standard they argue Court should apply to assess Cannistra's reasonableness in failing to comply with the Administrative Order.

---

[11] The statute allows the Government to seek penalties for any period in which a property owner unreasonably refuses to allow access, whether or not an order is in place, *see* 42 U.S.C. § 9460(e)(5)(b), but here EPA seeks penalties only for the period following the effective date of the Administrative Order.

Defendants urge the Court to adopt the standard applied by courts in *United States v. Gurley*, 235 F. Supp. 2d 797, 803-05 (W.D. Tenn. 2002), *aff'd*, 384 F.3d 316 (6th Cir. 2004), and *United States v. Ponderosa Fibres of Am.*, 178 F. Supp. 2d 157, 162-63 (N.D.N.Y. 2001), which seemingly found that the key question for evaluating reasonableness was whether the non-complying party was *capable* of complying with the order.  *See Gurley*, 235 F. Supp. 2d at 805 ("Nowhere in his Response has Gurley suggested the type of justification – such as accidental destruction of requested documents or other severe, atypical logistical problems impeding a proper response – which courts have found to be reasonable."); *Ponderosa Fibres*, 178 F. Supp. 2d at 162-63 ("[S]ection 104(e) of CERCLA does not require *mens rea* to establish a violation," and "the Government need not demonstrate that the defendant intended to act unreasonably, only that he in fact did act unreasonably.")

Conversely, Cannistra argues that *Gurley* and *Ponderosa Fibres* are inapposite because those cases concerned defendants' failures to provide EPA with requested information under CERCLA, rather than a failure to allow access to real property.  (ECF No. 118 at 12-13.) Instead, Cannistra urges the Court to adopt the standard applied by the Sixth Circuit in *United States v. Taylor*, 8 F.3d 1074, 1077 (6th Cir. 1993).  *Taylor,* which interpreted a Michigan state law somewhat similar to CERCLA, applied a more subjective standard, reasoning that the inherent due process concerns regarding a landlord's right to exclude meant that, in order to levy a civil penalty against a landlord who refuses access, there is no presumption that the state is entitled to a penalty (even though the statute contained a presumption that the request for access was reasonable), and the government is affirmatively required to show that the exclusion was unreasonable.  *See Taylor*, 8 F.3d at 1077-78.  "If the state wants to collect a fine," the court

21

reasoned, "the state must shoulder the burden of persuading the court that the landowner acted unreasonably in denying the state's request for access." *Id.* at 1077.

I am unpersuaded by Cannistra's attempt to distinguish *Gurley* and *Ponderosa Fibres*. Cannistra provides no support in the text of CERCLA for its argument that the phrase "unreasonably fails" in § 9604(e)(5)(B) means something different in the context of failing to grant access to real property, as opposed to failing to respond to information requests. The plain statutory language explicitly provides that "the court may assess a civil penalty . . . against any person who unreasonably fails to comply with provisions of paragraph (2) [access to information], (3) [entry to property], or (4) [inspections] or an order issued pursuant to subparagraph (A) of this paragraph," making no distinction between the categories. 42 U.S.C. § 9604(e)(5)(B). Additionally, "[t]he imposition of a civil penalty . . . serves to deter conduct that obstructs the EPA's goals of removal and remediation." *United States v. Lawrence Aviation Indus., Inc.*, No. 06-CV-4818, 2019 WL 1259791, at *17 (E.D.N.Y. Mar. 19, 2019). It strains credulity to suggest that Congress would intend to make it more difficult for EPA to collect penalties from those who deny access to real property than from those who withhold information, because "[w]ithout access, the EPA cannot act in the first instance to identify serious health and environmental hazards and take steps to remedy them[;] . . . the denial of access to a CERCLA site is one of the most serious types of violations." *United States v. JG-24, Inc.*, 331 F.Supp.2d 14, 72 (D.P.R. 2004).

That said, I will assume without deciding that a property owner is not unreasonable as a matter of law whenever it is capable of complying but chooses not to, and instead will address whether the Government has shown that Cannistra's refusal here was unreasonable. I agree with Defendants that Cannistra "unreasonably denied access by imposing unacceptable pre-conditions

to access." (ECF No. 119 at 6.)  Putting aside Cannistra's subjective motivations, discussed

below, it laid out a series of demands that went well beyond the reasonable.  Although it

abandoned some of the more preposterous ones – such as EPA providing reimbursement for lost

revenue and EPA completing the work on a national holiday – it adhered to its position that EPA

should do its work:  (1) before and after business hours, with a lengthy period of inactivity in

between – an obvious inefficiency that would have wrought havoc with the workers' schedules;

(2) in two phases, perhaps weeks apart, with similar results; and (3) at night, with concomitant

safety risks from darkness and fatigue.  These demands were highly unusual.  (*See* ECF No. 113

¶ 27.)  Cannistra's repeated pushback was largely responsible for a delay of over a year in EPA

getting onto the property.  Even after the issuance of the Administrative Order, Cannistra

continued to try to dictate the days and hours of EPA's work.  (P's 56.1 Resp. ¶¶ 51, 53.)  There

is nothing special about Cannistra or Tesla that would make it reasonable to exalt them over any

other owner who would have to endure inconvenience, and even loss of revenue, to allow EPA to

determine if the property poses a health hazard.

I find, therefore, that the Government has shown not only that it was not logistically

impossible for Cannistra to comply with the Administrative Order, but that Cannistra

unreasonably denied access through its preconditions and its refusal to consent even after

issuance of the Order.

In determining the appropriate penalty amount for CERCLA violations, courts typically

consider:  "(1) the good or bad faith of the [non-compliant party], (2) the injury to the public, (3)

the [non-compliant party's] ability to pay, (4) the desire to eliminate the benefits derived by a

violation, and (5) the necessity of vindicating the authority of the enforcing agency." *United

States v. M. Genzale Plating, Inc.*, 807 F. Supp. 937, 939 (E.D.N.Y. 1992) (collecting cases).

The first factor, the good or bad faith of the defendant, weighs in favor of a significant penalty.  While it is true that "Cannistra [itself] never polluted the environment," (ECF No. 118 at 17), it nevertheless "deliberately violated the EPA Order by refusing to allow the EPA access" to its property "despite having previously recognized EPA's authority to enter [its] property to conduct [testing]."  *Genzale*, 807 F. Supp. at 937.  Additionally, Cannistra's principals here apparently decided to put their own financial interests above a potentially serious threat to the environment and the health and safety of the workers and customers at the Tesla Dealership. Cannistra explicitly argues in its brief that "the Administrative Order exposed Cannistra to the risk that the testing activities would significantly impact the operations of the Tesla Dealership and damage its landlord-tenant relationship with Tesla – a relationship that was vital to Cannistra's financial well-being."  (ECF No. 108 at 6).  And Cannistra does not dispute that it did not even inform Tesla that EPA sought to test for radioactive contamination until sometime in April 2019, nearly a year after Cannistra knew that such work would be necessary.  (P's 56.1 Resp. ¶ 50.)  The fact that Cannistra dragged out the process of EPA obtaining access, continuing to collect rent while its tenant was in the dark about a possible health and safety hazard, reveals a remarkable lack of concern over potential radioactive contamination on the property and suggests the need for a substantial penalty.

The second factor, injury to the public, also favors a significant penalty.  Cannistra argues that there was no public injury because "there was no reason for anyone (including the EPA) to believe the Property posed any material health or safety risks to the public or employees who worked at the Premises" and that "[t]he principals of Cannistra had personally worked at the Property for decades, were thoroughly familiar with its condition, and never believed the premises posed a health risk to anyone."  (ECF No. 118 at 17.)  Courts have concluded, however,

that "a potential injury to the public is enough to satisfy the second factor."  *United States v. Timmons Corp.*, No. 03-CV-951, 2006 WL 314457, at *16 (N.D.N.Y. Feb. 8, 2006).  Here, the undisputed facts show that EPA had a reasonable basis to conclude that the Cannistra Property might be contaminated with dangerous radioactive materials that were harmful to the environment and human health.  (*See* P's 56.1 Resp. ¶ 15.)  It supplied Cannistra with ample scientific support for its concern.  (*See id.* ¶ 24; ECF No. 109-1 at 229-250; ECF No. 109-2 at 1-81; AO at 25-47.)  And the notion that the public was never in any real danger from radioactive material because Cannistra's principals were personally unconcerned with the risk is, to put it charitably, irrelevant.  That said, the CanRad site was a non-NPL site, and Cannistra could reasonably have inferred, from lulls in EPA's activity,[12] that the situation was not emergent.  This factor thus weighs in favor of large penalty, but not heavily.

The third factor, ability or inability to pay, does not significantly weigh one way or the other.  Defendants point out, (ECF No. 111 at 41), and Cannistra does not dispute, (ECF No. 115 ¶ 44), that the rental income from Tesla is sufficient for Cannistra's principals to use to help cover mortgage payments on a different building they own through a different company.  Cannistra, as part of an agreement to avoid discovery into its finances, agreed not to raise inability to pay.  (*See* ECF No. 118 at 18 n.4.)  Thus, it appears Cannistra has the potential ability to satisfy a civil penalty here.

The fourth factor, the benefit to Cannistra as a result of its failure to comply, is difficult to quantify because the only benefit to Cannistra, as things played out, was delay – a delay that enabled it to collect rent for a year before informing its tenant of the EPA's concerns and (it

---

[12] For example, EPA does not seem to have followed-up with Cannistra between June 26 and July 30, 2018, (ECF No. 109-2 at 207-08), and it took from December 4, 2018 to March 12, 2019 for EPA to secure the Administrative Order, (P's 56.1 Resp. ¶¶ 40, 43).

thought) risking the tenant breaking the lease.  This factor therefore does not weigh in favor of a significant penalty.

Finally, with respect to the fifth factor, the necessity of vindicating EPA's authority, the undisputed facts again weigh in favor of a significant penalty.  Courts have described the fifth factor as "[t]he most important [one] . . . supporting the imposition of a significant civil penalty . . . in matters such as this." *Timmons*, 2006 WL 314457 at *17 (cleaned up).  "A significant penalty is necessary to underscore the seriousness of the . . . authority of EPA and to ensure it is not ignored . . . ." *Id.*  Frankly, EPA has far more important work to do, and far more important ways to spend its limited resources, than negotiating, and then litigating, with property owners who impose a myriad of access conditions before allowing the mitigation of potential dangers to the environment and public health.  "[T]o allow an unreasonable denial" of access, like Cannistra's here, "to go unpunished . . . would encourage others" to refuse to grant EPA access to private property to test for harmful contaminants, which in turn would impede "the agency's ability to remedy problem sites."  *Id.* (cleaned up).

Defendants request a penalty in the amount of $2,000 to $3,000 per day, comparable to the penalties imposed in *Genzale* and *JG-24*, for a total penalty between $168,000 to $249,000 for the 83 days of non-compliance at issue.  (ECF No. 119 at 10.)  While a significant penalty is warranted, I believe that the $2,000 to $3,000 per day range is too high.

First, the violators in *Genzale* and *JG-24* were both active polluters of the sites in question.  *See JG-24*, 331 F. Supp. 2d at 700-71; *United States v. M. Genzale Plating, Inc.*, 723 F. Supp. 877, 881 (E.D.N.Y. 1989).  And while it is true that a civil penalty under 42 U.S.C. § 9604(e)(5) is imposed for failing to grant entry rather than for the act of polluting itself, I believe

that preventing EPA from remedying hazardous conditions of one's own creation is a more egregious form of violation than Cannistra's conduct here.

Second, courts have imposed a broad range of penalties for non-compliance, many of which are significantly below the range Defendants suggest.  *See Timmons*, 2006 WL 314457, at *17 ("[C]ourts [across the country] have proposed penalties of $2,000, $1,000, $500, $75, and $55 per day depending on the situation") (collecting cases); *see also, e.g.*, *Gurley*, 235 F. Supp. 2d at 808-09 (applying a three-tiered penalty structure of $2,000/day, $1,000/day, and $500/day for different periods of time, depending on egregiousness, for a total of $1,908,000 in information case against direct polluter); *United States v. Martin*, No. 99-CV-1130, 2000 WL 1029188 at *10 (N.D. Ill. July 26, 2000) ($75/day for total of $45,525 in information case against direct polluter); *United States v. Barkman*, 784 F. Supp. 1181, 1190 (E.D. Pa. 1992) ($55/day for total of $38,500 in information case against direct polluter).[13]  Even in this circuit, more recently assessed per-day penalty amounts are not consistent with those imposed in *Genzale* and *JG-24*.  *See Lawrence Aviation Indus.*, 2019 WL 1259791, at *18 ($275/day for total of $750,000 in information case against direct polluter).

On the other hand, Plaintiff here denied access, not just information; EPA had been patient for months before it issued the Administrative Order; it seeks penalties only for the period following the issuance of that Order; putting Tesla sales ahead of the public interest is hardly justifiable; and it is important to deter those who might otherwise similarly fail to recognize the EPA's authority.  Thus, the penalty imposed must sting.

---

[13] These numbers also do not take inflation into account.

The Court determines, in light of its analysis of the five factors and its reading of the comparable cases,[14] that a penalty of $750 per day is warranted here. This amounts to a total aggregate penalty of **$62,250**.[15]

## IV.  **CONCLUSION**

For the reasons stated above, Defendants' motion is GRANTED and Cannistra's motion is DENIED. The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 103, 110), enter judgment for Defendants on Plaintiff's claims and Defendant's second counterclaim,[16] assess a civil penalty of $62,250 against Cannistra, and close the case.

**SO ORDERED.**

Dated: December 27, 2021
         White Plains, New York

_____
      CATHY SEIBEL, U.S.D.J.

---

[14] No hearing is necessary because my decision is based on undisputed facts.

[15] Defendants seek a penalty for 83 days of non-compliance after the Administrative Order was issued. ($750 * 83) = $62,250.

[16] Defendants' first counterclaim, for an order enforcing compliance with the Administrative Order for access, is moot.